IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

AMANDA BENT BOLT CO.,
Plaintiff,

v.

Case No. 2:02-CV-1039
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Mark R. Abel

LOGGHE STAMPING CO.,
Defendant.

## OPINION AND ORDER

This matter is before the Court for consideration of the Defendant's Motion for Partial Summary Judgment (Doc. #47) and the Plaintiff's Motion for Summary Judgment (Doc. #53). For the reasons that follow, the Defendant's motion is denied and the Plaintiff's motion is granted in part and denied in part.

I.

Plaintiff, Amanda Bent Bolt Co. ["Plaintiff"] brings this action against Defendant Logghe Stamping Co. ["Defendant"] in connection with a contractual agreement for the manufacture of certain automotive parts. Counts 1 and 2 of the Complaint are for breach of contract and Count 3 is for quantum meruit. Defendant brings a counterclaim seeing reimbursement for expenses incurred in inspecting the parts Plaintiff manufactured. Plaintiff is an Ohio corporation and Defendant is a Michigan corporation. The amount in controversy exceeds the sum of $75,000. Accordingly, the Court has jurisdiction pursuant to 28 U.S.C. § 1332.

Plaintiff is a manufacturer of component parts used in the auto industry. The dispute in

this case arises from the Plaintiff's manufacture of seat striker rods[1] beginning in the year 2000 to be used in the then upcoming model of the Chrysler minivan. Plaintiff had previously manufactured twenty million striker rods for an earlier model of the Chrysler minivan[2].

Defendant supplies component parts to auto makers. On October 1, 1999, Daimler Chrysler issued a series of purchase orders to Defendant to supply the seat striker assembly for the Chrysler minivan. (Deposition Exhibit F). The purchase orders were to satisfy approximately 65% to 100% of Chrysler's requirements beginning with the 2001 model year and continuing on a yearly basis thereafter[3]. (*Id.*). To satisfy its contract with Chrysler, Defendant Logghe executed four blanket purchase orders with Plaintiff on April 11, 2000. (Deposition Exhibit L). Plaintiff was to produce twelve million parts per year for Defendant. (*Id.*).

Prior to entering into the purchase orders with Plaintiff, representatives of Defendant and Chrysler visited the Plaintiff's Logan, Ohio plant to evaluate the manufacturing process for the striker rods. (Deposition Exhibit J; *Deposition of Gary Ruff* at 38). Defendant notified Plaintiff on March 17, 2000 of its pre-production approval of the Plaintiff's methods for making the striker rods. (*Deposition of Dan Logghe* at 36-37). Four days earlier, on March 13, 2000, Plaintiff advised Defendant of a concern with the striker rod manufacture. According to Plaintiff, both the material selected by Chrysler for the manufacture as well as the design of the

---

[1] Striker rods are used to anchor passenger seats to the floor of certain models of the Daimler Chrysler minivan.

[2] According to Plaintiff, none of the parts manufactured was defective.

[3] Defendant states that Daimler Chrysler could terminate its contract with Defendant at any time by not issuing new "releases." A release is a written document specifying a volume of parts to be manufactured under a blanket purchase order.

rod[4] caused the cracking of certain rods during the production process. (Deposition Exhibit K). Plaintiff notified Defendant that it was "very concerned with these latest findings and will work towards answers and resolutions expeditiously." (*Id.*). The parties met to try to resolve the problem in October 2000. (Exhibit E to *Defendant's Motion*).

The purchase order includes the following provision: "Seller warrants that all items furnished will be free from defects in material and workmanship. Buyer shall have the right but not the obligation to inspect and test and/or reject any and all items and take corrective measures at seller's expense." (Exhibit A at ¶ 8 attached to *Defendant's Motion*). It is undisputed that during the time Plaintiff supplied Defendant with striker rods, a certain number were cracked.

In October 2000, Plaintiff developed a 7-Step Corrective Action plan to address the issue of cracking striker rods. Plaintiff indicated that a permanent solution had not yet been achieved but that Plaintiff would continue to inspect the rods manually "pending customer approval of the suggested design and material changes." (Deposition Exhibit O). Between 2000 and 2002, Plaintiff produced 19,000,915 striker rods for Defendant. According to Plaintiff, only 414 parts were rejected by Defendant out of the total number produced. (Deposition Exhibits R and S). Defendant argues that Plaintiff shipped over 1,100 cracked rods to the Defendant. Defendant contends that if the defective rods had not been discovered, they could lead to serious injury or death of a passenger in a minivan. (*Motion for Partial Summary Judgment* at 4-5).

In January 2001, Defendant sent Plaintiff a letter regarding a reduction in purchase order requests from Daimler Chrysler. The letter stated:

---

[4]Daimler Chrysler chose the material for the manufacture of the striker rods and also designed the part. (*Deposition of Jeffrey Mosko* at 54).

3

> As you are aware, Daimler Chrysler Corporation has reduced the amount of all purchase orders issued to their tier one suppliers by 5%. This action has a great impact on us since DC is our largest customer, by far. In response to this non-negotiable action, Logghe Stamping requires help from our supply base.
>
> Logghe Stamping is requesting an across the board 5% reduction on all blanket purchase orders. Pleas note this is a request. We are willing to entertain all proposals involving cost reduction that will be mutually beneficial.
>
> Logghe Stamping prefers to establish and keep suppliers for the long term. However, be advised that a lack of participation will result in the market testing of your business. Please feel free to contact me with any questions, comments or ideas concerning this issue.

(Exhibit C to *Defendant's Motion*).

Sometime in late spring or early 2001, Defendant communicated with another company, Windsor Machine, regarding the manufacture of striker rods. According to Defendant, it was dissatisfied with Plaintiff's performance in manufacture and allegedly ineffective inspection of the striker rods[5]. Windsor Machine began delivering striker rods to Defendant in April 2002, using the same material and design, according to the Defendant, that Plaintiff used in the manufacturing process. Plaintiff claims that Defendant chose Windsor Machine as a supplier because it manufactured the striker rods at $.02 cheaper per part.

Plaintiff claims that there were occasions in 2002 when Defendant contacted it for parts without first issuing releases. (*Affidavit of Lee Ann Specht* at ¶ 5). According to Ms. Lee Ann

---

[5]Defendant claims that Plaintiff's inspection of the striker rods was deficient, causing Defendant to hire a third party to perform inspections and paying cash bounties to Defendant's employees who discovered a cracked rod during their own inspections. These costs allegedly amount to over $100,000. (Counterclaim, ¶¶ 20 and 32).

In contrast, Plaintiff claims that it did all in could to prevent cracking of the striker rods. Plaintiff incurred expenses to inspect the rods, spent $72,000 on computerized camera inspection systems, hired metallurgists, sampled different types of steel and met with Defendant and Daimler Chrysler numerous times to attempt to rectify the problem. (Deposition Exhibits M, P, V, Y).

4

Specht, Plaintiff's shipping coordinator, Defendant's purchasing manager, Jeff Mosko, instructed Plaintiff to continue making parts and Defendant would forward releases later. (*Id.* at ¶ 7). Defendant denies this assertion. Plaintiff claims that it had manufactured a supply of 1,075,165 parts specifically for Defendant, at a cost of $204,281.35. According to Mosko, with the exception of a shipment of 5,000 rods in September 2002, Defendant never asked Plaintiff to manufacture parts without a written release. (*Affidavit of Jeffrey Mosko* at ¶¶ 21-24, attached as Exhibit 1 to *Defendant's Memorandum contra*).

Plaintiff also claims that, as of October 2002, it shipped $134,000 worth of striker rods to Defendant that Defendant used but for which Plaintiff was not paid. (Deposition Exhibit C). Defendant denies this assertion.

In return, Defendant argues that Plaintiff should have been aware, by at least September 2002, that Defendant had selected a new supplier for the manufacture of striker rods. Defendant relies upon a September 6, 2002 letter from Plaintiff to Mosko, which states:

> As discussed with you on the phone, Amanda has 340,000 pieces of each of the four styles of strikers on hand that we would like to propose a $.02 lower piece price on these parts to encourage Logghe to take them from us. These parts will be sent to you with the color coded dots of inspection on each one to verify they had been looked at for defects. We have these parts on hand to support your releases during regular production so that we would never be short handed when you needed parts. We typically do not have a problem with these parts sitting on the shelf for six weeks or so but find that with a little oil on them (oil that does not effect your weld process) they can set [*sic*] for long periods of time without rusting. If this proposal is acceptable we would like to ship them to you in the next couple of months. . . .

(Exhibit H attached to *Defendant's Motion*). Defendant responded with a counter-proposal on September 19, 2002. Defendant proposed a $.09 lower piece price per striker rod for the balance of pieces manufactured by Plaintiff but not released by Defendant and a right to reject and return

5

all material not meeting Defendant's quality standards. (Exhibit I, *Id.*). According to Defendant, the decrease in price is to "cover internal costs of increased inspection, additional inventory management, etc." (*Id.*). Plaintiff did not respond to this proposal. The instant action was filed in October 2002.

Count 1 of Plaintiff's Complaint alleges breach of outputs and requirements contract, as governed by R.C. § 1302.19. Plaintiff claims that Defendant "breached its duty of good faith to exclusively purchase Ten Million (10,000,000) to Twelve Million (12,000,000) of the Daimler / Chrysler parts from plaintiff over the course of the contract's ten year term." (*Complaint* at ¶ 19). Plaintiff seeks damages for lost profits, totaling $8,900,000, pursuant to R.C. § 1302.82(B).

Count 2 of Plaintiff's Complaint alleges breach of contract for the $134,065.00 worth of parts shipped to Defendant in 2002 which were billed but allegedly not paid for by Defendant. (*Id.* at ¶¶ 27-28). In addition, Plaintiff seeks $204,282 in payment for 1,075,165 parts which it manufactured for Defendant in 2002 but which were never shipped. (*Id.* at ¶¶ 29-30).

Count 3 of Plaintiff's Complaint is for quasi-contract, quantum meruit. In the event that no express contract is found to exist between the parties with respect to the claims raised in Count 2, Plaintiff claims that it is entitled to relief under either quasi-contract or quantum meruit.

Defendant asserts a counterclaim, seeking to recover expenses it incurred in taking corrective measures as to the cracked striker rods. Defendant claims that it spent $357,600 in this regard. (*Counterclaim* at ¶ 32). Defendant also seeks an accounting and reimbursement for the unused portion of $274,800 it tendered to Plaintiff to design and manufacture fixtures and production tooling for the striker rods. (*Id.* at ¶ 41). According to Defendant, Plaintiff built no more than 6 of the 8 production tools needed. (*Id.* at ¶ 39).

6

Plaintiff moves for summary judgment on its claims and the Defendant's counterclaim. Defendant moves for summary judgment on Plaintiff's claims but not on its counterclaim.

## II.

The procedure for considering whether summary judgment is appropriate, is found in Fed. R. Civ. P. 56(c); this section provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158-59 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also, Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

The United States Court of Appeals for the Sixth Circuit has recognized that *Liberty Lobby*, *Celotex*, and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identifies a number of important principles in new era

7

summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257). The nonmoving party must adduce more than a mere scintilla of evidence in order to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita*, 475 U.S. at 586). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

### III.

#### A. Plaintiff's Count 1

The parties do not dispute that the contract for the supply of striker rods, which consists of blanket purchase orders and releases, constitutes an outputs and requirements contract under Ohio law. What is disputed is the duration of the contract and whether there was a breach.

Plaintiff claims that Defendant breached the contract by choosing another supplier. Plaintiff seeks lost profits for the alleged remainder of the contract term, which Plaintiff argues is until at least 2006. Defendant contends that it did not breach the contract because the contract

8

was for an annual supply of striker rods. In addition, Defendant argues that Plaintiff breached the contract by supplying a defective product. Defendant further argues that, even if there was a breach, Plaintiff cannot recover lost profits because it was performing the contract at an economic loss.

In support of its position, Plaintiff relies on the Sixth Circuit case of *Cyril Bath Co. v. Winters Industries*, 892 F.2d 465 (6th Cir. 1989). Defendant in that case contracted with Plaintiff for the supply of metal tubing to fulfill Defendant's contract with General Motors for manufacture of an engine intake manifold assembly. Plaintiff submitted a written quote to Defendant for the supply of metal tubes based on a three year program. The annual production requirements were 800,000 tubes in each of the first two years and 400,000 tubes in the third year. There was no dispute as to Defendant's breach of the contract; the only issue was calculation of lost profits.

With respect to the parties' agreement, the court stated that "[a] requirements contract is a contract which calls for one party to furnish materials or goods to another party to the extent of the latter's requirements in business." *Id.* at 467. Under Ohio law, the standard for a requirements contract is found at R.C. § 1302.19(A), which provides:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

As the Sixth Circuit observed, "[a] promise to purchase exclusively from one supplier may be either implicit or explicit." *Id.* (citation omitted). The court held that based on the specificity in the contract as to the number of tubes to be supplied for each of the three years, Defendant's

9

obligation to purchase from Plaintiff was explicit.

The contract in *Cyril Bath* clearly set forth a three year term for supply of metal tubes. Similarly, in this case, there is no doubt that Plaintiff was to supply striker rods on an annual basis; specifically, 12,000,000 per year. The parties do not dispute this. The issue is the duration of this annual commitment.

Plaintiff claims that it was to be Defendant's exclusive supplier until at least 2006[6]. According to Plaintiff, if it were not the exclusive supplier, Plaintiff would have charged more per part to make a greater profit. Defendant argues that the relationship was not exclusive and Defendant was justified to terminate the relationship pursuant to ¶ 10 of the Terms and Conditions of Purchase, which states that "[d]elinquency in delivery or otherwise unsatisfactory service will be considered cause for cancellation and/or rejection, at no expense to buyer. (Exhibit A at ¶ 10 attached to *Defendant's Motion*).

According to Defendant, the problem with cracked striker rods rendered Plaintiff's performance unsatisfactory. In addition, Defendant argues that by shipping cracked rods, Plaintiff violated ¶ 8 of the Terms and Conditions, which states that "[s]eller warrants that all items furnished will be free from defects in material and workmanship . . . ." (*Id.* at ¶ 8). In short, Defendant contends that it had justification to terminate the annual relationship with Plaintiff.

Plaintiff maintains that it did not breach the agreement but rather, it did all that it could to

---

[6]The Complaint alleges until 2010, but its summary judgment motion, Plaintiff claims that Defendant has a good faith need for supply until 2006. (*Logghe Depo.* at 16). Thus, Plaintiff argues that it was to be the supplier for Defendant until at least 2006. In view of this representation, the Court will disregard Plaintiff's initial allegation that the contract was for a ten year term.

ensure against supplying cracked striker rods. Plaintiff asserts that the cracking was due to a defect in design and materials chosen by Chrysler for production of the striker rods. According to Plaintiff, because Defendant approved of Plaintiff's manufacturing in March 2000, after being informed of the potential for cracking, Defendant waived the right to terminate the contract on account of unsatisfactory performance as to this particular claim of defect. In addition, Plaintiff argues that the term "unsatisfactory performance" as used in ¶ 10 of the Terms and Conditions is subject to Defendant's written quality control rating procedure which applies to the performance of suppliers. The procedure states:

> 5.1.7 Raw material and/or component subcontractors are disqualified and removed from the approved vendor list when any of the following occur:
> a) No answer to an [sic] corrective action is supplied after approximately 180 days after issuance.
> b) Completed corrective action determined to be incomplete and/or ineffective by the Purchasing Manager that are not resolved after 90 days.

(Deposition Exhibit I).

Plaintiff argues that it complied with this procedure. Plaintiff presented a corrective action plan in October 2000. (Deposition Exhibit O). Although the parties met on various occasions to attempt to resolve the issue with cracked striker rods, the problem was not solved. Plaintiff received written notification of Defendant's dissatisfaction in July 2001. In January 2002, Defendant had closed a Supplier Corrective Action file created regarding Plaintiff's performance because "January's quality performance was found to be acceptable." (Deposition Exhibit Z). On January 22, 2002, Plaintiff sent the following letter to Mr. Mosko:

> Amanda has been working diligently to eliminate the cracking condition in the corners of the striker wire that we a [sic] providing to you. As you know we have discussed radius changes and material changes that would help alleviate this concern. In the meantime we have increased are [sic] on line sorting to 200% and

11

> are insuring this study is done using a color mark on each individual part. We have been constantly studying and maintaining the tools to maximize the radius. At the raw material state we bring in the wire on carriers to minimize any handling defects that may occur during the processes and have implemented an inspection of this material as it is received. We are working on some tooling concepts right now to see if we can process this part differently to add in resolving this concern. Amanda has also studied sensing devises that would check the part in process and verify that no cracks exists [*sic*], but have no fix at the present time. I will call you to discuss any concerns that you may have to this information.

(*Id.*).

Based on the foregoing, and the fact that Defendant's quality control documents show that only 414 out of 19 million parts produced were rejected by Defendant, Plaintiff argues that it was well-within the quality standard established by Defendant. Plaintiff's claim is that Defendant terminated its relationship with Plaintiff because it found a supplier who could manufacture the striker rods at a cheaper cost.

In the Court's view, whether Plaintiff was performing the contract satisfactorily and whether Defendant could claim dissatisfaction are genuine issues of material fact, resolvable only after a trial, and not on summary judgment. While Plaintiff argues that it complied with Defendant's procedures, Defendant contends that it incurred great expense to remedy Plaintiff's alleged poor performance. Thus, genuine issues of material fact exist in this regard.

Furthermore, while it is clear that Plaintiff was to manufacture 12,000,000 parts per year for Defendant, the Court finds that there are genuine issues of material fact as to whether Defendant could seek a new supplier for the manufacture of striker rods or whether the parties contemplated that Plaintiff would be the exclusive supplier for Defendant's needs. The Court cannot resolve these issues as a matter of law. Thus, neither Plaintiff nor Defendant is entitled to

summary judgment on Count 1[7].

## B. Plaintiff's Count 2

### 1. Plaintiff's claim regarding parts shipped and used in 2002

Plaintiff claims that it should be paid for striker rods shipped and allegedly used by Defendant in 2002. Plaintiff seeks $134,065 in this regard. In support of its claim, Plaintiff points out that Defendant's quality rating and vendor reports do not show any defective parts being shipped in Spring and Summer 2002. (Deposition Exhibit S). Defendant's Vice President, Dan Logghe, testified on deposition that it used the parts for which Plaintiff seeks payment. (*Logghe Depo.* at 121-22). Accordingly, Plaintiff seeks payment for goods accepted, pursuant to R.C. § 1302.65(A)[8].

In moving for summary judgment and in opposing Plaintiff's motion, Defendant focuses on Plaintiff's alleged breach of contract for sending defective striker rods. Since the undisputed evidence before the Court shows that Plaintiff shipped $134,065 of parts to Defendant in 2002, that Defendant used these parts and has made no claim that they were defective, Plaintiff is entitled to payment on the claim. Plaintiff is entitled to summary judgment on this aspect of its Count 2.

The Court notes that, in its Memorandum *contra* Plaintiff's motion, Defendant states that

---

[7]In view of this ruling, the Court also cannot conclude, as a matter of law, whether Plaintiff is entitled to lost profits or not. This can be resolved only after resolution of whether Plaintiff was an exclusive supplier and whether there was a breach of contract entitling Plaintiff to damages.

[8]This provision states: "The buyer must pay at the contract rate for any goods accepted." R.C. § 1302.65(A).

13

it issued releases to Plaintiff "for an aggregate of 130,000 striker rods that Amanda never provided to Logghe . . . ." (*Mosko Affidavit* at ¶ 26 attached as Exhibit 1 to *Defendant's Memorandum contra*). This allegation is not contained in Defendant's Answer or Counterclaim. In addition, Plaintiff has not responded to the allegation in the context of the pending cross-motions for summary judgment. In the interest of fairness, the Court will permit Plaintiff to file a response to this allegation, supported by evidence permitted under Rule 56, within ten (10) days of the date of this Order. If no response is filed, the Court will treat the allegation as uncontested and determine the issue of damages at a later date.

### 2. Plaintiff's claim regarding parts manufactured but not shipped in 2002

The second aspect of Count 2 of Plaintiff's Complaint is that it is entitled to recover damages for the 1,075,165 parts Plaintiff manufactured for Defendant in 2002 but which allegedly were never shipped because Defendant contracted with a different supplier. According to Plaintiff, it was told to manufacture the parts despite the absence of releases being issued by Defendant. Ms. Specht, Plaintiff's shipping coordinator, avers that Defendant's purchasing manager, Jeff Mosko, instructed Plaintiff to continue making parts and Defendant would forward releases later. (*Affidavit of Lee Ann Specht* at ¶ 7).

Defendant denies this assertion. According to Mr. Mosko, with the exception of a shipment of 5,000 rods in September 2002, there were never occasions where Plaintiff made shipments for which releases had not been issued. (*Affidavit of Jeffrey Mosko* at ¶¶ 21-24, attached as Exhibit 1 to *Defendant's Memorandum contra*). In addition, Defendant contends that Plaintiff manufactured additional striker rods at its own peril. In this regard, Defendant

14

points to the September 6, 2002 letter from Plaintiff to Jeff Mosko, which states:

> As discussed with you on the phone, Amanda has 340,000 pieces of each of the four styles of strikers on hand that we would like to propose a $.02 lower piece price on these parts to encourage Logghe to take them from us. These parts will be sent to you with the color coded dots of inspection on each one to verify they had been looked at for defects. We have these parts on hand to support your releases during regular production so that we would never be short handed when you needed parts. We typically do not have a problem with these parts sitting on the shelf for six weeks or so but find that with a little oil on them (oil that does not effect your weld process) they can set for long periods of time without rusting. If this proposal is acceptable we would like to ship them to you in the next couple of months. . . .

(Exhibit H attached to *Defendant's Motion*). Defendant responded to this letter with a counter-proposal on September 19, 2002. Defendant proposed a $.09 lower piece price per striker rod for the balance of material at Plaintiff not released by Defendant and a right to reject and return all material not meeting Defendant's quality standards. (Exhibit I, *Id.*). According to Defendant, the decrease in price is to "cover internal costs of increased inspection, additional inventory management, etc." (*Id.*). Plaintiff did not respond to this proposal and filed suit in October 2002.

The Court concludes that genuine issues of material fact exist as to whether the Plaintiff can recover payment for the 1,075,165 parts purportedly manufactured at Defendant's request. Plaintiff claims that the parties had course of dealing by which parts were manufactured in advance of Defendant issuing releases. Defendant denies this assertion and argues that Plaintiff manufactured an excess of striker rods at its own peril. In view of the divergent evidence on this issue, the matter is left for resolution by the trier of fact. Neither Plaintiff nor Defendant is entitled to summary judgment on this aspect of Count 2 of Plaintiff's Complaint.

## C. Plaintiff's Count 3

Defendant moves for summary judgment on Count 3 of Plaintiff's complaint, a quasi contract theory for quantum meruit. In the Complaint, it is clear that Plaintiff presents this as an alternate theory to Count 2, which is for breach of contract.

As Defendant points out, a quasi contract is a contract implied in law and derives from principles of equity. *Hummel v. Hummel*, 133 Ohio St. 520 (1938). The two remedies most often associated with the theory of quasi contract are restitution and quantum meruit. "[Q]uantum meruit is a doctrine derived from the natural law of equity, the basic concept of which is that no one should be unjustly enriched who benefits from the services of another. In order to prevent such an unjust enrichment, the law implied a promise to pay a reasonable amount for the services rendered . . ., in the absence of a specific contract." *Sonkin & Melena Co., LPA v. Zaransky*, 83 Ohio App.3d 169, 175 (Cuyahoga Co. 1992).

There is no dispute that an express contract exists in this case. Thus, Plaintiff's alternative theory of quantum meruit has no application to Plaintiff's claims. Count 3 of the Plaintiff's Complaint is dismissed.

## D. Defendant's Counterclaim

Defendant asserts a counterclaim, seeking to recover expenses it incurred in taking corrective measures as to the cracked striker rods. Defendant claims that it spent $357,600 in such measures. (*Counterclaim* at ¶ 32). Defendant also seeks an accounting and reimbursement for the unused portion of $274,800 it tendered to Plaintiff to design and manufacture fixtures and production tooling for the striker rods. (*Id.* at ¶ 41). According to Defendant, Plaintiff built no

more than 6 of the 8 production tools needed. (*Id.* at ¶ 39).

Plaintiff moves for summary judgment on the counterclaim arguing that according to the parties' course of dealing both Plaintiff and Defendant would inspect the striker rods at their own expense. According to Plaintiff, Defendant cannot now claim a setoff of expenses incurred, because Defendant did not comply with R.C. 1302.91, which provides:

> The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract.

With respect to the tooling used to manufacture the striker rods, Plaintiff submits that the counterclaim should be dismissed because Defendant can pickup the tooling at Plaintiff's facility any time.

In response, Defendant denies that there was any course of dealing between the parties as to each bearing its own expense as to inspection of the striker rods. Defendant points out that ¶ 8 of the Terms and Conditions states that "[b]uyer shall have the right but not the obligation to inspect and test and/or reject any and all items and take corrective measures at seller's expense." (Exhibit A at ¶ 1 attached to *Defendant's Motion*). Defendant contends that genuine issues of material fact preclude a judgment in Plaintiff's favor on the counterclaim. The Court agrees. The Court cannot decide the issue as a matter of law and thus, must await resolution at trial.

The Court notes that Plaintiff does not address the Defendant's claim for accounting and reimbursement for the unused portion of $274,800 tendered to Plaintiff to design and manufacture fixtures and production tooling for the striker rods. Plaintiff simply states that the items it has may be reclaimed at any time. On the present record, the Court cannot resolve this portion of the counterclaim as a matter of law.

17

## IV.

In light of the foregoing, the Defendant's Motion for Partial Summary Judgment (**Doc. #47**) is **DENIED**. The Plaintiff's Motion for Summary Judgment (**Doc. #53**) is **GRANTED in part and DENIED in part**.

This matter will be set for Trial by separate Order.

**IT IS SO ORDERED.**

2-7-2006
**DATE**

EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE